*977 OPINION OF THE COURT
Raymond E. Cornelius, J.
This proceeding involves the issue of custody for Anne Wallace, a child born out of wedlock on November 5, 1977 to the respondent, Karen Teal. The petitioner, John Wallace, alleges that he is the natural father of the child, and the court makes such a finding. This finding is sustained, in part, by an order of Monroe County Family Court, dated March 20, 1978, which approved a paternity agreement between the petitioner and the Monroe County Department of Social Services. Although the binding effect of such agreements upon a natural mother, without a waiver or agreement on her part, may be subject to question in other circumstances, the proof in this case indicates that the respondent mother had accompanied the petitioner father when the paternity agreement had been signed at the offices of the Department of Social Services. Furthermore, the actions and statements by the respondent indicate that she regarded the petitioner as the natural father. In short, there is no issue presented in this proceeding regarding paternity and petitioner’s standing.
Subsequent to the birth of the child, in January, 1978, the Monroe County Department of Social Services filed a petition, pursuant to article 10 of the Family Court Act, alleging that the child, Anne Wallace, was a neglected child, and naming the mother as respondent. It appears that this proceeding was precipitated, in part, by a protective referral made by a hospital where the child had been admitted on or about January 6, 1978 because of a failure to thrive. In fact, on January 12, 1978, a temporary order was made by this court placing the child with the Monroe County Department of Social Services for placement in foster care.
On February 3, 1978, the neglect proceeding was adjourned in contemplation of dismissal for a period of one year, pursuant to section 1039 of the Family Court Act, upon certain terms and conditions set forth in the order. Thereafter, in October of 1978, the Department of Social Services filed a petition against the respondent herein, alleging a violation of the adjournment in contemplation of dismissal. By order dated October 31, 1978, the petitioner in this proceeding, John Wallace, was permitted to intervene in the neglect proceeding, and that matter was heard contemporaneously with the fact-finding hearing on the issue of custody.
At the conclusion of the proof offered by the Monroe County *978 Department of Social Services, the court granted the respondent’s motion to dismiss the petition alleging the violation of the adjournment in contemplation of dismissal. Therefore, there has been no finding with respect to either the original neglect petition or the violation petition, and these proceedings will not be considered as any evidence on the issue of custody. Nevertheless, there are certain events which occurred during the pendency of these proceedings, especially during the period of time the child was placed in foster care, which may be relevant to the present issue. In this connection, it should be mentioned that the child remained in foster care until March 5, 1979, at which time the child was placed with the paternal grandmother, based upon the consent of all parties, pending a final determination on the proceedings.
There is a sharp disagreement between the petitioner and respondent concerning when the petitioner was first apprised about the child, and his initial interest. The respondent maintained that her relationship with the petitioner ended in March of 1977 because he became aware of her pregnant condition, and indeed, wanted the respondent to have an abortion. Miss Teal further related that, both before and after the birth of the child, she would make telephone calls to Mr. Wallace but he evinced no interest in her or the child and did not make any visits to the hospital at the time of the birth. Conversely, the petitioner denies these allegations.
The court does not believe that a resolution on this particular point to be important because of the subsequent events. Both parties agree that, several months after the birth of the child, the respondent did forward a letter to the petitioner requesting that he become involved with his child. The petitioner testified that he first acquired knowledge of the child when he discovered a picture of the child, together with a letter, which had been received at his mother’s home and presumably read by his mother. The court might infer that the respondent’s mother prompted the initial interest on his part, but in any event, he did contact the respondent and the child immediately after receipt of the letter, and has maintained a deep interest in the child since that time.
The court finds that Mr. Wallace was primarily responsible for admission of the child to the hospital in January, 1978, and visited the child during the period of time the child was a patient. After release of the child from the hospitalization and continuing during the period of time the child was placed in *979 foster care, the petitioner father visited frequently. During these visits, he would play, talk and otherwise attempt to carry on a meaningful relationship with the child within the time restraints set by the Department of Social Services. On September 26, 1978, upon the petitioner’s application, an order was granted permitting him overnight visitation with the child. Again, during the overnight visitation and other home visits permitted, the petitioner exhibited affection toward the child, and gave the child his personal attention by feeding the child, changing clothes, etc.
The petitioner was born in Jamaica on February 20, 1959, and came to Rochester to live with his mother when he was approximately 10 years of age. He resided with his mother until February of 1979, and now resides with Miss Cathy Moore, whom he intends to marry sometime next year, in a two-bedroom family-complex apartment. At the time of the hearing, Mr. Wallace was about to begin employment as an assistant machine operator with a company located in the same town in which he resides, and anticipated gross earnings in the approximate amount of $187 per week. The petitioner had been unemployed since March of 1979, at which time he had terminated his employment with Eastman Kodak Company, where he had been employed for over one year.
The petitioner has been dating Miss Moore for over two years, and several months prior to the hearing, they purchased baby furniture for purposes of accommodating this child. The child has stayed overnight with the petitioner and Miss Moore and the latter has testified that she wishes to care for the child. Miss Moore is approximately 19 years of age, and, at present, is employed as a clerk-typist by the County of Monroe.
The respondent, Karen Teal, is 21 years of age, having been born on January 14, 1958 in Rochester, New York. She is the mother of one other child, who is three years of age, and together, they resided in a two-bedroom apartment in the City of Rochester since March of 1979. Miss Teal has had several other residences since the birth of Anne, and has supported herself primarily from public assistance during this period of time.
On one occasion in April of 1979, the respondent experienced some difficulty in obtaining her public assistance check to pay for her apartment. At that particular time, she did state a preference for custody of Anne to be placed with the *980 grandmother, and also discussed the possibility of placing her other child in foster care. In addition, the respondent has experienced difficulties with the criminal law, which have resulted in one or more convictions and incarceration for brief periods of time.
One of the involvements with the criminal law resulted in a period of probation, but the respondent failed to co-operate and the court concludes that the probation proved unsatisfactory for this reason. The respondent also exhibited a poor attitude in her relationship with the foster care worker from the Department of Social Services, frequently engaging in loud, angry conversations, in addition to swearing at her. This angry behavior and lack of good judgment were also manifested to some extent during the fact-finding hearing.
. Based upon the above recitation of facts, the court is led to the conclusion that the best interests of the child, Anne Wallace, dictate that custody be awarded to the petitioner father. Although both parents have expressed love, affection and interest in the child, Mr. Wallace has impressed the court as being the parent who would be most able to provide stability in the child’s upbringing, and success for the child’s future. Nevertheless, the "best interests” standard has not been applied by the New York courts in determining custody of illegitimate children. The rule has evolved that the natural mother of an out-of-wedlock child is prima facie entitled to custody as opposed to the child’s father unless it be shown that she has abandoned her right or is not a proper and suitable parent. (People ex rel. Olecharski v Nepereny, 26 NY2d 1010; People ex rel. Meredith v Meredith, 272 App Div 79, affd 297 NY 692; Matter of Loretta "Z” v Clinton "A”, 36 AD2d 995; Matter of Norcia v Richard, 32 AD2d 656, affd 26 NY2d 740; Roe v Doe, 58 Misc 2d 757.)
In the instant proceeding, the respondent mother has not been proved, in the court’s opinion, to have abandoned her right to custody, or otherwise shown to be unfit or improper as a parent. Indeed, the proof indicates that Miss Teal has cared for her other child, who is three years of age, and has maintained an interest in the child, Anne. The question therefore becomes whether or not the well-established case law, cited above, continues to be the prevailing standard in determining custody of out-of-wedlock children in New York State. In Matter of Boatwright v Otero (91 Misc 2d 653), the Onondaga County Family Court departed from this well-estab *981 lished law, and held that the "best interests” standard should apply in cases where the unwed father "has openly acknowledged paternity and has maintained an ongoing relationship with his child”. This decision was based, in large part, upon the Supreme Court’s decision in Stanley v Illinois (405 US 645), which had invalidated an Illinois statute providing that an illegitimate child became a ward of the State upon the death of the natural mother. The court ruled that removal of such a child to the State without according the natural father a hearing constituted a violation of the due process and equal protection clauses of the Constitution.
In this past year, the Supreme Court has again had the opportunity to address a law which makes a gender based distinction, as applied to the legal status of children born out of wedlock. In Caban v Mohammed (441 US 380), section 111 of the New York Domestic Relations Law, which permitted adoption of illegitimate children without the consent of the natural father, was declared to be unconstitutional. The court again held that the distinction between the rights of unmarried mothers and the rights of unmarried fathers could not be sustained on any rational basis.
Finally, in a very recent New York case, an award of custody was made to the father of a child born out of wedlock, Richard D. v Wendy P. (64 AD2d 882). This case was then affirmed by the New York State Court of Appeals by a memorandum decision, which stated, in part, as follows: "The Family Court, after hearing testimony from both parents and other witnesses and considering psychological reports submitted by a forensic team appointed by the court, concluded that it would be in the child’s best interests for custody to be awarded to the child’s father. On the record we find no basis for setting aside that determination.” (47 NY2d 943, 944.)
Based upon the Supreme Court’s clear position regarding any gender based distinction as applied to children born out of wedlock, and the progeny thereof for any and all aspects of future child custody cases, this court is of the opinion that the former, well-established case law in New York is no longer valid. In other words, the presumption that the natural mother should be awarded custody, absent a showing of unfitness, must yield to the "best interests” test.
As already indicated above, application of the "best interests” standard in this particular proceeding results in the petitioner father being awarded custody. Nevertheless, this *982 award is not made without some reservation. During the course of these proceedings, and pending a decision, it was necessary for the court to receive additional testimony based upon an allegation that the petitioner had violated the temporary order of this court, wherein custody had been placed with the paternal grandmother. Although the court finds that his actions were not willful and the court therefore declines to make any finding of contempt, the petitioner’s decision to take the child and the failure to return the child, without consent, disclose a lack of good judgment. Also, the court is concerned about the petitioner’s attitude toward the respondent, and his anticipated co-operation in extending visitation privileges to the respondent.
On the issue of visitation, the court directs that Miss Teal be entitled to extremely liberal visitation with her child, and suggests that this be arranged through the paternal grandmother. As a minimum, the respondent should be entitled to overnight visitation every other weekend from Friday at 6:00 p.m. to Sunday at 6:00 p.m., and in addition, days when her work schedule would permit. If the parties need a further clarification or specification from the court as to a visitation schedule, the court reserves the right to either party to make such application.